UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.

STAR-BRITE DISTRIBUTING, INC.,

       Plaintiff,

v.

GOLD EAGLE CO.,

       Defendant.

_____/

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff, Star-Brite Distributing, Inc. ("Star-Brite"), brings this action against Defendant, Gold Eagle Co. ("Gold Eagle"), and alleges:

## NATURE OF THIS ACTION

1.    This action for injunctive relief and money damages arises out of the false and/or misleading comparative marketing and sales campaign by Gold Eagle against Star-Brite, and specifically, Star-Brite's best-selling product and one of the leading fuel treatment products in the marine industry – Star Tron® Enzyme Fuel Treatment ("Star Tron®").  Gold Eagle's false and/or misleading advertising campaign is being waged in, among other places, marine retail stores, including West Marine, the largest specialty retailer of boating supplies and accessories.

2.    Gold Eagle's false marketing and sales campaign and unlawful conduct violates: (i) Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a); (ii) the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201, *et seq.*; (iii) Florida's False Advertising Statute, Fla. Stat. §817.41; and (iv) common law unfair competition.

3.     Star-Brite seeks, *inter alia*, an injunction to immediately stop Gold Eagle's false and/or misleading advertising, and an award of compensatory damages, treble damages, punitive damages, disgorgement of profits, and reasonable attorney's fees and costs.

## PARTIES

4.     Star-Brite is incorporated under the laws of the State of Florida and has its principal place of business at 4041 SW 47th Avenue, Fort Lauderdale Florida, 33314.

5.     Gold Eagle incorporated under the laws of the State of Illinois and has its principal place of business at 4400 S. Kildare Avenue, Chicago, Illinois, 60632.

## JURISDICTION AND VENUE

6.     This Court has federal question jurisdiction over Star-Brite's Lanham Act claim pursuant to 28 U.S.C. §1331 because the claim arises under a federal statute, 15 U.S.C. §1125(a).

7.     This Court also has diversity jurisdiction pursuant to 28 U.S.C. §1332(a). Gold Eagle is a citizen of a different state than Star-Brite and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

8.     This Court has supplemental jurisdiction over Star-Brite's state law claims pursuant to 28 U.S.C. §1367 because the state law claims are so related to the federal claim that they form a part of the same case or controversy and derive from a common nucleus of operative facts.

9.     This Court has personal jurisdiction over Gold Eagle in that Gold Eagle has sent or caused products which it manufactures to be sent to the State of Florida, has caused advertisements of the products it manufactures to be sent to the State of Florida, and is transacting business in the State of Florida, within the meaning of the Florida long-arm statute, §48.193, Florida Statutes.

## FACTUAL BACKGROUND

A.     **STAR TRON® AND STA-BIL® ARE DIRECT COMPETITORS IN THE FUEL IMPROVEMENT MARKET**

10.     Star-Brite was founded in 1973, and at the time sold a line of automotive maintenance items.  In the following years, Star-Brite added many new car care products and expanded into the boat care field.  It was in the marine marketplace that Star-Brite experienced phenomenal growth and began to have a loyal consumer following.  Currently, Star-Brite sells its products in virtually every developed country in the world and is a leader in its fields.

11.     Star-Brite has a fuel improvement product that it sells under the Star Tron® brand.  Star Tron® is the only enzyme based fuel additive on the market used to treat ethanol gasoline, commonly referred to as E10 fuel.  Star Tron® uses highly specialized enzymes to modify how gasoline and diesel fuel burns, which results in a more complete and uniform combustion.  Star Tron® cleans the fuel delivery system and combustion chambers, stabilizes fuel chemistry, and reduces engine emissions.  Star Tron®  can be used in all gas engines including, boats, cars, trucks, motorcycles and small equipment.

12.     Star Tron® is Star-Brite's number one selling product and one of the top products in treating engine problems using E10.  This is in significant portion due to Star-Brite's investment of significant financial resources, human resources, and sweat equity to create the best product on the market.

13.     Gold Eagle is in the business of producing and distributing aftermarket fluids and additives.  Gold Eagle manufactures a brand of fuel stabilizers and ethanol treatments known as STA-BIL® for use in engines in boats, cars, lawnmowers, RVs, and jet skis.  STA-BIL® products include STA-BIL® Marine, an ethanol fuel treatment and stabilizer, which Gold Eagle claims is specially formulated for use in harsh marine environments and offsets the effects of

moisture in ethanol-blended fuels and protects marine engines during storage.   STA-BIL® products, including STA-BIL® Marine, compete directly with Star-Brite by, among other means, manufacturing, marketing and sales in interstate commerce a fuel improvement product to consumers.

**B.    THIS COURT PREVIOUSLY ENJOINED A STAR TRON® COMPETITOR FROM USING SIMILAR, MISLEADING COMPARATIVE ADS BASED UPON THE STABILITY TEST (ASTM D525) AND CORROSION CONTROL TEST (NACE TM 0172), WHICH WERE HELD INAPLICABLE TO AN ENZYME-BASED E10 FUEL ADDITIVE IN THE MARINE ENVIRONMENT**

14.    In 2009, another competitor, attempted to improperly limit Star Tron® in the market by using similar misleading advertising.   That attempt failed.   This Court enjoined Kop-Coat, Inc. under the Lanham Act from, *inter alia*, advertising or marketing of any comparison ads based upon any testing regarding fuel stability or corrosion control.   The Court held that those tests were not applicable to E10 stored in boat fuel tanks.   *See* Findings of Fact and Conclusions of Law and Order Granting Motion for Preliminary Injunction, dated August 31, 2009, in *Star-Brite Distributing, Inc. v. Kop-Coat, Inc.*, Case No. 09-60812-CIV-COHN/SELTZER, U.S. District Court, Southern District of Florida, attached as **Exhibit A.**

15.    Gold Eagle has had actual knowledge of the Court's ruling in the *Kop-Coat* case since March 2012 when Star-Brite informed members of the National Marine Manufacturers Association ("NMMA"), including Gold Eagle.

16.    Notwithstanding Gold Eagle's knowledge of the Court's ruling in the *Kop-Coat* case, as alleged more fully below, Gold Eagle has recently commenced a marketing and sales campaign to deceive potential buyers of Star Tron® into buying STA-BIL® based upon comparison ads using the same inapplicable fuel stability and corrosion control tests.

17.     The timing of Gold Eagle's misleading advertising and sales campaign was specifically designed to take advantage of the boat storage season commencing in September. Before storing boats, consumers purchase fuel stabilizers, like Star Tron®, to keep the fuel fresh during storage.

C.     **GOLD EAGLE'S LITERAL FALSITIES AND MISLEADING STATEMENTS ABOUT STAR TRON® AND STA-BIL®**

18.     To increase sales of STA-BIL®, Gold Eagle created and recently began an "enzyme free" and "no enzyme" public marketing and sales campaign to attempt to discredit Star-Brite's highly successful Star Tron® product.  Because Star Tron® is the only enzyme based fuel additive on the market used to treat E10, Gold Eagle's "enzyme free" and "no enzyme" campaign is specifically directed at Star Tron®.

19.     Gold Eagle's marketing campaign includes promoting, advertising and selling STA-BIL® Marine with a product information tag or "neck hanger", attached to the "neck" of the STA-BIL® Marine product bottle (the "Product Information Tag").  A copy of the one such Product Information Tag used by Gold Eagle is attached hereto as **Exhibit B**.

20.     The Product Information Tag also contains an advertisement comparing results of two tests performed on STA-BIL® Marine, Star Tron® and other products (the "Comparison Ad").

21.     The purpose of the Product Information Tag and the Comparison Ad is to influence consumers to purchase STA-BIL® Marine, instead of Star Tron®.

22.     The cover page of the Product Information Tag for STA-BIL® Marine boldly states "Enzyme Free!" and is depicted below:



23.     The next page of the Product Information Tag is entitled "Why are STA-BIL®

Brand Products Enzyme Free" and is depicted below:



24.     This page of the Product Information Tag makes the following false and/or

misleading claims and representations:

      a.     "Industry standard tests prove that STA-BIL® MARINE is more effective!"

      b.     "Independent testing proves that STA-BIL® MARINE'S formula is more effective than the enzyme treatment.  See page 4 and 5 for independent lab test results."

      c.     "Enzymes are chemicals that affect natural processes like digesting food. Protecting gasoline, preventing corrosion, and improving engine performance are NOT natural processes.  If we can't test it and prove it, we won't use it or claim it."

25.    The Product Information Tag also contains the following Comparison Ad, showing two tests that purportedly establish that STA-BIL® Marine outperformed Star Tron® in the areas of gasoline stability and corrosion control:[1]



---

[1] Another similar product information tag used by Gold Eagle for STA-BIL® Marine, a copy of which is attached as **Exhibit C**, also contains the Comparison Ad depicting the gasoline stability and corrosion control tests. The allegations in the Complaint regarding the use of and the statements regarding those tests also apply to this product information tag (Exhibit C hereto.)

26.     The statements in the Comparison Ad were intended by Gold Eagle to demonstrate functional superiority in favor of STA-BIL® compared to Star Tron®. However, the tests and the statements in the Comparison Ad are literally false and/or misleading.

27.     The chart of the Gasoline Stability Test (above) contains a header that contains the false and/or misleading representation that "STA-BIL® Marine Ethanol Fuel Treatment Outperforms Competition in Keeping Fuel Fresh!"

28.     The chart of the Gasoline Stability Test contains a footer that states:

> Results based on Independent Lab
> ASTM D525 Test, February 2013

29.     According to Gold Eagle, the results of the Gasoline Stability Test, which purports to measure the percentage of time increase of fuel stability vs. base test fuel, were follows:

| STA-BIL® Marine | VALVTECT® Ethanol Gasoline Treatment | STAR TRON® Enzyme Fuel Treatment | Biober EB® Gasoline Ethanol Treatment | Sea Foam® Motor Treatment |
|---|---|---|---|---|
| 53.48% | 29.64% | 6.33% | 1.19% | -2.20% |

30.     The chart of the Corrosion Protection Test (above) contains a header that contains the false and/or misleading representation that "STA-BIL® Marine Ethanol Fuel Treatment Outperforms Competition in Corrosion Control."

31.     The chart of the Corrosion Protection Test contains a footer that states:

> Results based on Independent Lab
> NACE TM 0172 Corrosion Test, February 2013

32.     According to Gold Eagle, the results of the Corrosion Protection Test, which purports to measure steel rods placed in water/E-10 blended gasoline for 4 hours, showed that STA-BIL® Marine outperformed Star Tron®.[2]

### 1.     The Stability Test (ASTM D525) and Statements Therein are Literally False and/or Misleading.

33.     Fuel stability is important to the consumer as it tells the consumer the shelf life of diesel fuel or gasoline before it starts to turn into a gummy sludge like material.  Gold Eagle used the ASTM D525 test to compare the fuel stability of STA-BIL® Marine with Star Tron®.  Importantly, the ASTM D525 test must be run at temperatures of 212ºF, far in excess of conditions that virtually any boater's fuel tank would ever experience.  The likelihood of any boater experiencing such high temperatures is, at best, remote.  Therefore, the use of this test to assert STA-BIL® Marine's superiority over Star Tron® when it is being used in a marine vehicle is plainly misleading.  Additionally, the exceedingly high temperature of 212ºF poses a second very significant problem with the comparison: Star Tron® uses enzyme technology that may not perform to its maximum capabilities at $212^o$ F, but nevertheless will work extremely well as a stability additive for E10 fuel under normal operating marine conditions.  STA-BIL® Marine, on the other hand, is unlikely to be negatively impacted by the $212^o$ F temperature because it is not enzyme based.  Essentially, to compare Star Tron® with STA-BIL® Marine using this test is to place Star Tron® at a significant disadvantage before the test even begins.

34.     Notably, ASTM D525 was originally drafted in 1939, when gasoline fuels were inherently more unstable.  The language cited in the ASTM D525 test protocol indicates that ASTM D525 is not an applicable test upon which to base a comparison advertisement for E10

---

[2] Gold Eagle's claimed comparative results on the Gasoline Stability Test are inconsistent with the purported comparative stability test results reflected on Gold Eagle's product information tag for STA-BIL® Protection, an ethanol fuel treatment product.

fuel. The "Scope" of ASTM D525 establishes that this test is appropriate only for finished gasoline, and not for gasoline including oxygenates such as E10. In fact, Note 2 of ASTM D525 contained within the "Scope" warns the user that "the precision data were developed with gasoline's derived from hydrocarbon sources only without oxygenates." E10 is an oxygenate. In other words, ASTM D525 was not meant to test E10 fuel, the precise fuel that STA-BIL® Marine and Star Tron® are designed to treat. This renders the ASTM D525 test and test results meaningless to consumers of STA-BIL® Marine and Star Tron®.

35.    More language of the ASTM D525 protocol expounds on the unreliability of the test, as the Significance and Use section of ASTM D525 points out that, "It should be recognized . . . that its correlation with the formation of gum to storage may vary materially under different storage conditions and with different gasoline."

36.    For these reasons, the Comparison Ad's statement of the test results regarding fuel stability is literally false and/or misleading.

## 2.    The Corrosion Control Test (NACE TM 0172) and Statements Therein are Literally False and/or Misleading.

37.    Corrosion control is extremely important to consumers as water and organic acids can deteriorate the fuel and cause corrosion of the fuel tank walls, injectors, metals, and fuel delivery system.

38.    The Comparison Ad seeks to establish STA-BIL® Marine's superiority over Star Tron® using NACE Test TM 0172 (the "NACE Test"). There are various false and/or misleading factors related to the use of the NACE Test.

39.    First, the NACE Test is inapplicable to E10 and has no bearing or relevance in the boating industry. The actual test is titled "Determining Corrosive Properties of Cargoes in Petroleum Product Pipelines," according to the NACE Test protocol, the "purpose of this

standard test method is to provide a uniform method of testing the corrosive properties of petroleum product pipeline cargoes."  As the title and protocol indicate, the test refers to ascertaining the corrosive effect of gasoline and other petroleum cargoes on a steel pipeline during transit, not in boat fuel tanks.  In fact, the forward of the NACE Test confirms, "the purpose of this standard test method is to provide a uniform method of testing the corrosive properties of petroleum product pipeline cargoes."

40.     E10 fuel — the very fuel that Star Tron® and STA-BIL® Marine are designed to treat — is never sent through pipelines because E10 fuel is blended prior to delivery to the purchaser and not mixed at the refinery.  Also, the NACE Test evaluates petroleum cargoes flowing through a pipeline, unlike a boat fuel tank where fuel is often stored, and not flowing. Additionally, Section 1.3 of the NACE Test states "this test method does not predict corrosiveness in standing aqueous phase" meaning that this test is not appropriate to form the basis of a comparison ad concerning E10 stored in a boat fuel tank.

41.     Second, the Comparison Ad improperly makes reference to rust.  The rusting of a pipeline has no bearing or relevance on boat fuel tanks, as pipelines are made of uncoated steel and boat fuel tanks are largely made of high density polyethylene with other boat fuel tanks made of aluminum, and a very small percentage being made of fiberglass.   Neither high density polyethylene, aluminum, nor fiberglass is subject to rust.

42.     For these reasons, the Comparison Ad's statement of the test results regarding corrosion is literally false and/or misleading.

43.     In sum, Gold Eagle's literally false and/or misleading representations are as follows:

a.      "Industry standard tests prove that STA-BIL® MARINE is more effective!"

b.      "Independent testing proves that STA-BIL® MARINE'S formula is more effective than the enzyme treatment."

c.      "STA-BIL® Marine Ethanol Fuel Treatment Outperforms Competition in Keeping Fuel Fresh!"

d.      "STA-BIL® Marine Ethanol Fuel Treatment Outperforms Competition in Corrosion Control.

e.      The results of the Gasoline Stability Test and Corrosion Protection Test contained in the Comparison Ad are false and/or misleading because, among other reasons, the tests used are not sufficiently reliable to permit one to conclude with reasonable certainty that they establish the claims made, as the Comparison Ad repeatedly cites to tests that are inapplicable to form the basis of a comparison ad involving E10 additives.

f.      Gold Eagle's Product Information Tag also contains the false and/or misleading statements that "Enzymes are chemicals that affect natural processes like digesting food.  Protecting gasoline, preventing corrosion, and improving engine performance are NOT natural processes.  If we can't test it and prove it, we won't use it or claim it." Contrary to Gold Eagle's statements, there are hundreds of U.S. patents using enzyme catalysts in petroleum products.  In addition, although Gold Eagle intends to deceive consumers into believing that fuel additives containing enzymes harm engines, Star Tron® is safe for all engines.

44.     All of the literally false and/or misleading statements made in the Product Information Tag, including the Comparison Ad, were made to distinguish STA-BIL® from Star Tron® and were made by Gold Eagle despite being well aware of their falsity.  Such literally

false and/or misleading claims, especially in light of Gold Eagle's refusal to compete on the merits by creating falsities about STA-BIL®, is material because the Product Information Tag, including the Comparison Ad, likely will motivate a significant proportion of consumers to purchase STA-BIL® and divert potential consumers from purchasing the competing Star Tron®.

45.     Gold Eagle has decided to disseminate, publish and maintain the Product Information Tag, including the Comparison Ad, knowing that they contain literally false, misleading, deceptive, and unfair claims and representations, and that they would be interpreted as a claim of superiority.

46.     Such willful falsity and/or deception should be taken into consideration in determining, pursuant to the violated federal and state laws, whether Gold Eagle should be ordered to issue corrective advertising and whether Star-Brite should receive injunctive relief, actual damages, enhanced damages up to three times actual damages, punitive damages, the disgorged profits unlawfully reaped by Gold Eagle, and associated legal fees and costs incurred Star-Brite.

47.     As a direct and proximate result of Gold Eagle's willful publication and continued maintenance of the unlawful Product Information Tag and Comparison Ad, Star-Brite has suffered and is continuing to suffer substantial irreparable and monetary harm, including damage to Star-Brite's sales, profits, business relationships, reputation and goodwill.   In addition, consumers are being harmed by their reliance on the falsities and deceptions within the Product Information Tag and Comparison Ad.   Such harm is likely to continue until the Product Information Tag and Comparison Ad are discontinued and corrective advertising is issued to dispel the lingering false impressions created by Gold Eagle.

48.     All conditions precedent to bringing this action have been performed, satisfied or waived prior to filing the action.

49.     Star-Brite has retained undersigned counsel to represent it in this action and is obligated to pay the firm reasonable attorney's fees and costs.

## COUNT I - FALSE ADVERTISING UNDER SECTION 43(a) OF THE LANHAM ACT

50.     Star-Brite incorporates by reference the allegations contained in paragraphs 1 through 49 above.

51.     Gold Eagle has made and continues to make false and/or misleading statements concerning Star Tron® in the Product Information Tag and Comparison Ad.  These statements are being made willfully, intentionally, and with full knowledge of their falsity.

52.     Gold Eagle's acts constitute material false and/or misleading representations of fact in commercial advertisements which have deceived or are likely to deceive a substantial segment of Star-Brite's present and potential customers, for which Gold Eagle is directly liable under Section 43(a) of the Lanham Act.  Gold Eagle has used and continues to use these false and/or misleading statements in connection with the marketing and sale of STA-BIL® to deceive Star-Brite's customers into believing that STA-BIL® is a better product than Star Tron®.

53.     Gold Eagle's use of the false and/or misleading statements has caused irreparable harm to Star-Brite.  Absent the issuance of an injunction, Star-Brite will continue to cause irreparable harm to Star-Brite, for which there is no adequate remedy at law.

54.     Further, Star-Brite has been damaged as a direct and proximate result of Gold Eagle's actions.

WHEREFORE, Star-Brite respectfully requests that this Court: (1) enter a preliminary injunction, thereafter made permanent, enjoining Gold Eagle from further publishing the false

and/or misleading and deceptive statements in any form, including the Product Information Tag attached hereto as Exhibit B, the product information tag attached hereto as Exhibit C, and the Comparison Ad; (2) requiring Gold Eagle to issue corrective advertising sufficient to dispel the lingering harmful effects of the Product Information Tag attached hereto as Exhibit B, the product information tag attached hereto as Exhibit C, and the Comparison Ad; (3) and enter a judgment against Gold Eagle for actual damages, enhanced damages up to three times actual damages pursuant to 15 U.S.C. § 1117(a), a disgorgement of profits to Star-Brite that Gold Eagle made as a result of the unlawful actions, as well as costs, and attorney's fees; and (4) award Star-Brite such other and additional relief that the Court deems just and proper.

## COUNT II - FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

55.     Star-Brite incorporates by reference the allegations contained in paragraphs 1 through 49 above.

56.     This cause of action is brought pursuant to Florida's Deceptive and Unfair Trade Practices Act, § 501.201, *et seq.*

57.     By the acts alleged above, Gold Eagle has engaged in unfair methods of competition, unconscionable acts or practices, and unfair and deceptive acts or practices in the conduct of its trade and in commerce.   Specifically, Gold Eagle has violated Chapter 501 by, among other things:

    a.      Violating Section 43(a) of the Lanham Act;

    b.      Violating Fla. Stat. § 817.41; and

    c.      Making and publishing the false and/or misleading claims and representations set forth in paragraph 43 above; and

58.     Star-Brite has suffered, and continues to suffer irreparable harm as a result of Gold Eagle's actions.  Such harm will continue unless Gold Eagle's actions are enjoined by this Court.

59.     Star-Brite has no adequate remedy at law.

60.     Moreover, as a direct and proximate result of Gold Eagle's unlawful acts, Star-Brite has been, and is being, damaged.

WHEREFORE, Star-Brite respectfully requests that this Court: (1) enter a preliminary injunction, thereafter made permanent, enjoining Gold Eagle from further publishing the false and/or misleading statements in any form, including the Product Information Tag attached hereto as Exhibit B, the product information tag attached hereto as Exhibit C, and the Comparison Ad; (2) requiring Gold Eagle to issue corrective advertising sufficient to dispel the lingering harmful effects of the Product Information Tag attached hereto as Exhibit B, the product information tag attached hereto as Exhibit C, and the Comparison Ad; (3) enter a judgment against Gold Eagle for actual damages in an amount to be determined at trial, punitive damages, attorney's fees, court costs; and (4) award Star-Brite such other and additional relief that the Court deems just and proper.

## COUNT III - FLORIDA STATUTORY FALSE ADVERTISING – FLA. STAT. § 817.41

61.     Star-Brite incorporates by reference the allegations contained in paragraphs 1 through 49 above.

62.     Florida Statutes § 817.41(1) provides as follows:

> It shall be unlawful for any person to make or disseminate or cause to be made or disseminated before the general public of the state, or any portion thereof, any misleading advertisement. Such making or dissemination of misleading advertising shall constitute and is hereby declared to be fraudulent and unlawful, designed and intended for obtaining money or property under false pretenses.

63.    Florida Statutes § 817.41(6), pertaining to misleading advertising, provides a civil cause of action arising out of misleading advertisement on the part of a defendant.  The statute provides that "[a]ny person prevailing in a civil action for violation of this section shall be awarded costs, including reasonable attorney's fees, and may be awarded punitive damages in addition to actual damages proven.  This provision is in addition to any other remedies prescribed by law."

64.    Florida Statutes § 817.40(5) states as follows with respect to the definition of "misleading advertising":

> The phrase "misleading advertising" includes any statements made, or disseminated, in oral, written, or printed form or otherwise, to or before the public, or any portion thereof, which are known, or through the exercise of reasonable care or investigation could or might have been ascertained, to be untrue or misleading, and which are or were so made or disseminated with the intent or purpose, either directly or indirectly, of selling or disposing of real or personal property, services of any nature whatever, professional or otherwise, or to induce the public to enter into any obligation relating to such property or services.

65.    Gold Eagle in direct competition with Star-Brite for business in Florida, and thus the misleading advertising contained in the Product Information Tag and Comparative Ad were disseminated in the course of such competition.

66.    The statements contained in the Product Information Tag and Comparative Ad are in printed form and were disseminated by Gold Eagle via its distributors and retailers.

67.    Gold Eagle had the right and ability to control the advertising contained in the Product Information Tag and Comparative Ad and the discretion to approve or reject the advertisements prior to their distribution to the public.

68.    The Product Information Tag and Comparative Ad set forth untrue or misleading statements and information relating to Star Tron®.

69.     Gold Eagle knew or through the exercise of reasonable care or investigation could or might have ascertained that the statements and information contained in the Product Information Tag and Comparative Ad were untrue or misleading.

70.     The Product Information Tag and incorporated Comparative Ad were disseminated to the public, subject to the right of control of Gold Eagle, with the intent or purpose, either directly or indirectly, of marketing and selling STA-BIL® , and to induce the public to purchase STA-BIL®, instead of Star Tron®

71.     Upon information and belief, consumers who have purchased STA-BIL® have relied on these misleading statements contained in the Product Information Tag and the Comparison Ad and reliance on these advertisements was reasonable and justified under the circumstances.

72.     Star-Brite has suffered, and continues to suffer irreparable harm as a result of Gold Eagle's actions.  Such harm will continue unless Gold Eagle's actions are enjoined by this Court.

73.     Star-Brite has no adequate remedy at law.

74.     Moreover, as a direct and proximate result of Gold Eagle's unlawful acts, Star-Brite has been, and is being, damaged.

WHEREFORE, Star-Brite respectfully requests that this Court enter a judgment against Gold Eagle for actual damages in an amount to be determined at trial, punitive damages, costs, attorney's fees, and award Star-Brite such other and additional relief that the Court deems just and proper.

## COUNT IV - COMMON LAW UNFAIR COMPETITION

75.     Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 49 above.

76.     Gold Eagle's conduct, including, but not limited to, the false and/or misleading statements in the Product Information Tag and the Comparison Ad, is likely to deceive customers.

77.     Gold Eagle's conduct is willful and intentional.

78.     As a result of Gold Eagle's conduct described herein, Star-Brite has sustained and will sustain irreparable injury for which no adequate remedy at law exists.

79.     Further, as a direct and proximate result of the Gold Eagle's unlawful acts, Star-Brite has been, and is being, damaged.

WHEREFORE, Star-Brite respectfully requests that this Court: (1) enter a preliminary injunction, thereafter made permanent, enjoining Gold Eagle from further publishing the false and/or misleading statements in any form, including the Product Information Tag attached hereto as Exhibit B, the product information tag attached hereto as Exhibit C, and the Comparison Ad; (2) requiring Gold Eagle to issue corrective advertising sufficient to dispel the lingering harmful effects of the Product Information Tag attached hereto as Exhibit B, the product information tag attached hereto as Exhibit C, and the Comparison Ad; (3) enter a judgment against Gold Eagle for actual damages in an amount to be determined at trial, a disgorgement of profits to Star-Brite that Gold Eagle made as a result of the unlawful actions, and punitive damages; and (4) award Star-Brite such other and additional relief that the Court deems just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Star-Brite demands a trial by jury of all issues triable of right by a jury.

August 13, 2014
Fort Lauderdale, Florida

By: _s/ Leonard K. Samuels_
Leonard K. Samuels, Florida Bar No. 501610
lsamuels@bergersingerman.com
Jeffrey S. Wertman, Florida Bar No. 003093
jwertman@bergersingerman.com
BERGER SINGERMAN LLP
350 East Las Olas Boulevard, Suite 1000
Fort Lauderdale, Florida  33301
Telephone:  (954) 525-9900
Facsimile:   (954) 523-2872
Attorneys for Plaintiff, Star-Brite Distributing, Inc.